## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

BOWEI XI,                                    )
                                             )
          Plaintiff,                         )
                                             )
     v.                                      )      Case No. 4:23-CV-88-PPS
                                             )
THE TRUSTEES OF PURDUE UNVIERSITY,           )
                                             )
          Defendant.                         )

## OPINION AND ORDER

Bowei Xi is a tenured Associate Professor of Statistics at Purdue University who alleges Purdue denied her application for promotion from associate to full professor because of her sex, race, and national origin. Xi also alleges Purdue retaliated against her when she protested the University's denial of her request for promotion. Purdue argues Xi's research record did not justify her promotion to full professor and moves for summary judgment on Xi's claims. Based on the record before the Court, Xi has failed to provide sufficient evidence to support her claims of discrimination or retaliation, and summary judgment will therefore be granted to Purdue.

### Factual Background

Xi failed to comply with Local Rule 56-1(b)(2) in her response to Purdue's statement of material facts. Local Rule 56-1(b)(2) requires the party opposing summary judgment to file a response to the moving party's statement of material facts that includes, among other things, "a verbatim restatement of [the moving party's] Statement of Material Facts." N.D. Ind. L.R. 56-1(b)(2). Xi's response to Purdue's

1

statement of material facts does not include a verbatim restatement of those facts.

Instead, in her response to Purdue's statement of material facts, Xi said she "focuse[d] only on disputed facts that are 'material'" and "reserves the right to dispute any and all facts . . . including those facts not specifically disputed herein." [DE 40 at 1 n.1.] That's not how Local Rule 56-1(b)(2) works. In fact, a failure to dispute facts in the manner dictated by the local rules renders the facts presented by the moving party as undisputed. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015). That said, I'll use Xi's response to identify any disputed material facts for purposes of summary judgment.

Purdue has three general categories of faculty: assistant professor (tenure-track), associate professor (tenured), and full professor (tenured). [DE 44 at ¶5.] Tenured faculty have a home academic department. [*Id.* at ¶6.] To seek promotion, a faculty member must navigate an elaborate and exhaustive multi-level review process. [*Id.* at ¶7.] Here's how it works: The first level of review occurs at the department level. [*Id.* at ¶8.] A Primary Committee chaired by the department head and generally consisting of all the department's tenured faculty review the candidate's promotion packet. [*Id.*] The voting members of the Primary Committee, which is usually everyone except the department head, then vote "yes" or "no" for each candidate. [*Id.*] From there, the department head decides whether to accept the recommendation of the Primary Committee. [*Id.*]

Candidates who advance to the second level are reviewed by the college-level Area Committee, which is chaired by the relevant college dean. [*Id.* at ¶9.] Other

members of the Area Committee include department heads and tenured full professors. [*Id.*] The Area Committee votes on each candidate, and the Dean reviews the Area Committee's recommendations. [*Id.*]

Candidates who advance to the third level are reviewed by a university-wide committee called the Campus Promotions Committee. [*Id.* at ¶10.] The Provost chairs the Campus Promotions Committee, and the remaining members are deans, one tenured full professor from each college, and additional at-large tenured faculty. [*Id.*] If the Campus Promotions Committee approves an applicant's promotion, they are forwarded to the Provost, who makes a recommendation to the President. [*Id.* at ¶11.] Lastly, the President then makes a recommendation to the Board of Trustees for a final decision. [*Id.*]

Voting at each level of the promotion process is confidential, and Purdue does not record individual committee members' votes. [*Id.* at ¶7.] If a candidate receives a negative decision at any level of review, they may submit a request for reconsideration to the Vice Provost for Faculty Affairs. [*Id.* at ¶12.] Grounds for reconsideration are limited to evidence of grossly inadequate consideration of professional competence or judgments based on erroneous or misinterpreted information. [*Id.*] The Vice Provost for Faculty Affair's decision on reconsideration is final. [*Id.*]

The Office of the Provost sends a memorandum to faculty at the beginning of each promotion cycle that includes guidance on Purdue's procedures for promotion. [*Id.* at ¶14.] The Office of the Provost sent the relevant memorandum for the promotion cycle at issue here on April 29, 2022. [*Id.*; DE 32-3 at 8–23.]

Candidates for promotion must meet minimum thresholds in three "mission areas": discovery, learning, and engagement. [DE 44 at ¶19; DE 32-2 at 59.] Under Purdue's system, "discovery" means "a record of scholarly achievement and evidence of national/international visibility." [*Id.* at 60; DE 44 at ¶22.] This includes "a substantial record of published original research or its equivalent" and "external funding (where it can be said to reflect the positive, rigorous assessment of peers and the scholarly promise of the topic), national and/or international reputation (if appropriate)." [*Id.*] In addition to these general criteria, colleges and academic departments may establish more specific criteria that is consistent with Purdue's guidelines. [*Id.* at ¶25; DE 32-2 at 59.] The College of Science and Department of Statistics both established additional guidelines and instructions for promotion and tenure. [DE 44 at ¶26; DE 32-2 at 79–101.]

Plaintiff Bowei Xi was born in China. [DE 44 at ¶30.] She began working at Purdue in 2004 as an Assistant Professor of Statistics. [*Id.* at ¶31.] Xi applied for but was denied a promotion to Associate Professor in 2009, but Purdue later promoted her as a tenured Associate Professor of Statistics in 2011. [*Id.* at ¶¶32–33.] Xi applied for promotion to Full Professor of Statistics in 2018 but was denied. [*Id.* at ¶35.] She again applied for promotion to Full Professor of Statistics in 2020 but withdrew her application after the Primary Committee vote. [*Id.* at ¶36.]

According to the Dean of the College of Science, Purdue previously offered the Research Refresh Award program to aid faculty who could benefit from dedicated time to reinvigorate stalled research. [*Id.* at ¶40; DE 32-2 at 6.] Purdue offered the award for

4

faculty whose research had not been active or had recently slowed. [*Id.*] The award provided grant money and dedicated time away from teaching to focus on research. [*Id.*]

Xi applied for the Research Refresh Award in April 2022. [DE 44 at ¶41.] In her application, she noted difficulties with the pregnancy and premature birth of her son in July 2020. [DE 32-1 at 166.] Xi took maternity leave for the Fall 2020 semester. [*Id.*] According to Xi, "[h]er research progress slowed down due to the unexpected pregnancy complication and the challenge to find childcare during the [COVID-19] pandemic." [*Id.*] She noted the program "would give a much-needed boost to help her regain momentum." [*Id.*] Purdue awarded Xi the Research Refresh Award for the 2022-2023 academic year. [DE 44 at ¶43; DE 32-1 at 179.] In his May 19, 2022, email that informed Xi of her award, Vice Provost for Faculty Affairs Peter J. Hollenbeck wrote Xi could "benefit from intense focus to advance [her] scholarship and reinvigorate [her] career." [*Id.*]

Xi says she applied for promotion to Full Professor of Statistics in November 2022. [DE 44 at ¶45.] Her application included her background information, details concerning her work applicable to the three "mission areas" of discovery, learning, and engagement, as well as letters of recommendation. [*Id.*; DE 32-1 at 97–163.] At the first level of review, the Primary Committee consisting of tenured professors within her department, Xi received a unanimous twelve to zero vote in favor of promotion. [DE 44 at ¶50; DE 32-1 at 164.]

At the second level of review, the Area Committee voted eleven to ten against Xi's promotion. [DE 44 at ¶52; DE 32-1 at 164.] The Area Committee wrote that their "decision focused on the quality of journals and conference proceeding in which [Xi] was publishing." [*Id.*] The Area Committee also cited Xi's recent selection for the Research Refresh Award and that she "had no active funding and thus not evident that her research program was in an upward trajectory." [*Id.*] Purdue claims the Area Committee did not receive or review Xi's Research Refresh Award application as part of its decision on Xi's promotion so did not know the reasons why Xi applied for the award. [DE 44 at ¶56.] Patrick Wolfe, then the Dean of the College of Science, participated in the Area Committee's discussion on Xi's application but did not vote. [*Id.* at ¶¶65–66.] Wolfe then reviewed and approved the Area Committee's decision to deny Xi's promotion. [*Id.* at ¶65.] In a January 3, 2023, letter the now Interim Dean of the College of Science Jean Chmielewski memorialized the reasons for the Area Committee's denial of her application. [DE 32-3 at 62.] Chmielewski noted that many of Xi's publications "were not in tier 1 journals" and pointed to Xi's "end of research funding in the coming year necessitating the Research Refresh award" as the bases for the Area Committee's decision. [*Id.*]

At the time of her application for promotion, Xi had funding from the Army Research Lab that ended in academic year 2024. [DE 44 at ¶¶57, 59.] According to Purdue, the Area Committee determined the Army Research Lab funding was not awarded through a competitive grant process. [*Id.* at ¶58.] Purdue says the Army Research Lab was Xi's only active external research funding source when she applied

for promotion in November 2022. [*Id.* at ¶57.] Xi's application lists the Army Research Lab grant as ending on May 14, 2024, and a second source of then active external funding from the Army Research Office that expired on January 6, 2023. [DE 32-1 at 115.] Xi says her Army Research Lab grant was later extended to 2027, but she does not contest that her November 2022 application listed the grant as expiring in 2024. [DE 44 at ¶60.]

On January 18, 2023, Xi met with Lucy Flesch, the then-Senior Associate Dean of the College of Science, and Hao Zhang, a Professor of Statistics, for feedback on the Area Committee's review of her application for promotion. [*Id.* at ¶67.] Flesch told Xi the Area Committee interpreted Xi's receipt of the Research Refresh Award as an indication Xi's research had slowed. [*Id.* at ¶69–70.] Zhang told Xi that applying for the Research Refresh Award may be interpreted as an admission that an individual has fallen behind on their research. [*Id.* at ¶71.] Flesch told Xi the Area Committee had concerns Xi did not have competitive federal grant funding at the time of her application for promotion and did not know whether her Army Research Lab funding was awarded through a competitive process. [*Id.* at ¶72.] Flesch encouraged Xi to solicit new letters of recommendation, submit grant applications to appropriate federal agencies, and encouraged Xi to wait to reapply until 2024. [*Id.* at ¶76.]

On January 25, 2023, Xi submitted a request for reconsideration of the denial of her promotion to Hollenbeck (then Purdue's Vice Provost for Academic Affairs). [*Id.* at ¶77; DE 32-1 at 200.] Xi said the grounds for her appeal were (1) grossly inadequate consideration of professional competence, and (2) judgments based on erroneous or

7

misinterpreted information. [DE 44 at ¶78; DE 32-3 at 25.] In her appeal, Xi listed two faculty who had received the Research Refresh Award and a subsequent promotion, but these individuals were not from the Department of Statistics or the College of Science and did not apply in 2022. [DE 44 at ¶83; DE 32-3 at 28.] Three individuals from the College of Science, including Xi as a member of the Department of Statistics, received the Research Refresh Award from 2018 to 2022. [DE 44 at ¶85.] But Xi does not dispute the two other award recipients from the College of Science either had not gone through the promotion process since receiving the award or were already a Full Professor. [*Id.*]

On January 28, 2023, Dennis Lin, who presented Xi's case to the Area Committee in his role as head of the Department of Statistics, emailed Hollenbeck. [DE 32-3 at 71–72.] Lin described the Primary Committee and Area Committee meetings on Xi's application, including the Committees' points of concern and his responses (in defense of Xi) to those concerns. [*Id.*] Lin wrote he "personally strongly supported [Xi's] promotion case" and "was so disappointed that the Area Committee did not [promote Xi that he] decided to step down" as head of the Department of Statistics. [*Id.*]

Purdue says Hollenbeck spoke with Flesch and Chmielewski about the Area Committee's deliberations on Xi's application. [DE 44 at ¶99.] According to Purdue, Hollenbeck determined the Area Committee had concerns with the lack of competitiveness for Xi's funding, her external funding ending soon, her receipt of the Research Refresh Award, and the lack of clarity of Xi's role in some of her listed publications. [*Id.*] Hollenbeck appears to have taken notes of this conversation on February 1, 2023. [DE 32-3 at 67.]

Hollenbeck emailed Xi on February 3, 2023, to inform her he was denying her appeal. [*Id.* at 74.] Hollenbeck said he assessed three issues: whether the Area Committee (1) ignored the unanimous vote of the Primary Committee; (2) misunderstood her publication record; and (3) misunderstood her research funding and awards. [*Id.*] Hollenbeck concluded the Area Committee "spent considerable time reviewing" Xi's application, and he found no evidence of misunderstood or grossly inadequate consideration. [*Id.*] Hollenbeck added "I do think that a few things could have been presented more clearly [in Xi's application], including the nature and duration of your research awards and your exact role in them." [*Id.*]

Xi emailed Interim Head of the Department of Statistics Daniel Cziczo on March 8, 2023, to indicate her intention to "re-apply for promotion to full professor in Spring 2023." [DE 32-6 at 6.] In his response on March 9, Cziczo said he would first like to meet with Xi during their one-on-one meeting scheduled for April 5. [*Id.*] Cziczo explained there were "issues" with reapplying in two consecutive years such as Purdue's policy that it does not replace letters of recommendation solicited in the prior year. [*Id.*] Cziczo said it would therefore be "extremely difficult" for Xi to re-apply in 2023, but he added "I would of course be open to discussing what the implications are regarding 2023." [*Id.*]

That same day, Cziczo emailed Xi's faculty mentors and reiterated "we are likely not able to run a case two consecutive years due to the shelf life of letters from last year." [*Id.* at 11.] Cziczo added: "this is a University rule so not one we can change." [*Id.*] Mark Daniel Ward, Professor of Statistics, responded he told Xi "we would be

willing to work with her to re-apply in two years if she wanted to try" and that it was "not possible to apply for two years." [*Id.* at 10.] Cziczo responded: "it is good to know we're giving her a consistent message, especially since it is a sensitive case . . . . we should assume the case can not move forward in 2023 but will in 2024." [*Id.* at 9.]

Purdue says Cziczo met with Xi on April 5, 2023, for her annual review and reiterated the risk of re-applying with the same letters of recommendation in 2023 due to the 24-month lifecycle of those letters. [DE 44 at ¶115.] Xi testified Cziczo told her he would "give up" if he was in her position, but Cziczo and Purdue dispute this allegation. [*Id.* at ¶120.] Cziczo said he told Xi they would discuss her case at the next Statistics Primary Committee meeting to solicit their recommendation on whether she should re-apply in 2023 or 2024. [*Id.* at ¶121.] Purdue says the Primary Committee recommended Xi wait to re-apply until 2024. [*Id.*] Xi testified she next asked to be considered for promotion to full professor in the spring of 2024. [*Id.* at ¶130.]

Xi filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 17, 2023. [DE 32-1 at 94–95.] Xi alleged discrimination based on her race, sex, national origin, and age. [*Id.*] But Xi did not check the box for retaliation. [*Id.*] Xi brought this lawsuit on October 19, 2023. [DE 1.] During a telephonic hearing on February 4, 2025, Xi moved for dismissal of her age discrimination claim and a separate race discrimination claim under 42 U.S.C. § 1981. [DE 28.]

## Standard of Review

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted). On a motion for summary judgment, all facts and reasonable inferences are construed in a light most favorable to the non-moving party. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

**Discussion**

Xi alleges Purdue discriminated against her on the basis or her race, national origin, and sex. She also claims to have been retaliated against for lodging complaints of discrimination. I'll take up the discrimination claims first before turning to the retaliation claim.

## I.    Race, National Origin, and Sex Discrimination Claims (Counts II, III, & IV)

Title VII makes it unlawful for an employer to refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual's race, color, religion, sex, or national origin. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018); 42 U.S.C. §2000e-2(a)(1). To survive summary judgment on her Title VII discrimination claims, Xi must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action." *Barbera*, 906 F.3d at 628 (quoting *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017)).

11

Evaluating discrimination claims using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains an efficient way to organize, present, and assess evidence related to claims of discrimination. But it's not the only way to analyze a discrimination case. As the Seventh Circuit explained in *Ortiz v. Werner Enters., Inc.*, courts may take a holistic approach and simply view all the evidence, direct and circumstantial, place it into a pile, and ask whether a reasonable juror could conclude based on all the evidence that discrimination was afoot. 834 F.3d 760, 765 (7th Cir. 2016). In a recent concurrence, Justice Thomas suggested the same thing. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313–19 (2025) (Thomas, J., concurring). Nevertheless, the Parties in this case have hewed closely to the *McDonnell Douglas* framework, so I will do so as well.

Under *McDonnell Douglas*, a plaintiff must make a prima facie case by showing (1) they are members of a protected class; (2) performed reasonably on the job in accord with their employer's legitimate expectations; (3) were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff makes out a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action, at which point the burden shifts back to the plaintiff to present evidence that the employer's explanation is pretextual. *Id.*

As alluded to in *Ortiz* and by Justice Thomas in his *Ames* concurrence, there is no magic to this test; it is merely one way of culling the relevant evidence needed to

12

demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's protected status. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894-95 (7th Cir. 2018). Just as the Parties have in their briefing, I will consider Xi's race, national origin, and sex discrimination claims jointly given the same framework and similar analysis for these claims.

Purdue concedes that Xi satisfies the first, third, and fourth elements of the *McDonnell Douglas* test. [DE 30 at 10.] Purdue argues Xi has not met the second element of this test because she cannot establish that she was qualified for promotion to full professor. Xi argues Purdue's proffered reasons for denying her promotion are a pretext for unlawful discrimination. This is the opposite side of the same coin. Indeed, the Seventh Circuit recognizes that analysis of the second element in the *McDonnell Douglas* framework—satisfactory job performance—and pretext are "inextricably intertwined." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007); *see also Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996) (same). So, courts may "proceed directly to the issue of pretext" given the second element of the *McDonnell Douglas* framework and considerations of pretext focus on essentially the same inquiry and evidence. *See Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998); *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). Because the bulk of the Parties' arguments focus on Xi's allegation of pretext, that is where I will focus as well.

Before diving into consideration of Purdue's proffered reasons for denying Xi's promotion, I must establish a few more ground rules. The first concerns the definition of pretext: it is "a lie, specifically a phony reason for some action" and "not just faulty

reasoning or mistaken judgment." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) (citation omitted). "Thus, when an institution proffers as reasons for [the adverse employment action] deficiencies in a plaintiff's scholarship, teaching, or service, the court is not concerned with whether plaintiff's scholarship, teaching, or service were in fact deficient; only with whether the defendant institution honestly believed they were deficient[.]" *Schneider v. Northwestern Univ.*, 925 F.Supp. 1347, 1369 (N.D. Ill. 1996).

Second, as alluded to above, I am mindful of the unique context of Title VII employment discrimination cases in the context of university decisions concerning tenure and promotion. In that regard, the Seventh Circuit has long recognized "the nuanced nature of tenure decisions and our corresponding reticence to second-guess the expert decisions of faculty committees." *Haynes v. Ind. Univ.*, 902 F.3d 724, 734 (7th Cir. 2018) (internal citation omitted). And "although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist, practical considerations make a challenge to the denial of tenure . . . an uphill fight— notably the absence of fixed, objective criteria for tenure at that level." *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 815 (7th Cir. 2012).

Xi is quick to point out that she is already tenured. From this, she implies that the cases just cited are somehow less relevant to her situation because this is not a denial of tenure case. True enough. But the decision to grant tenure and the decision to promote a tenured professor from associate to full professor are surely close cousins to one another, at the very least. This is because the same subjective factors used to decide who will get a promotion from associate professor to full professor at Purdue apply to the

14

considerations used to grant or deny tenure. So, cases like *Blasdel* remain highly instructive.

With this background, let's dive into whether Purdue's stated reasons for denying Xi' promotion were phony excuses to mask its actual discriminatory motive. Purdue says the Area Committee declined to promote Xi because, at the time she applied, she lacked competitive federal grant funding, her only active external funding expired the following year, she had recently been awarded the Research Refresh Award, and they had concerns with the quality of her publications and the conferences she attended. Xi argues these stated reasons fly in the face of her unanimous departmental support, strong external reviews, active federal funding, and she argues Purdue's reliance on her receipt of the Research Refresh Award is contradictory and unsupported by the record.

The Research Refresh Award lies at the heart of this dispute. Before we get there, though, I will analyze Xi's other alleged evidence of pretext. Xi argues the Area Committee's comments on her research are not credible and ignore her strong institutional and external support. [DE 36 at 9.] As evidence, Xi points to the unanimous Primary Committee vote to advance her promotion application and selectively quotes her letters of support, including a comment that "Purdue would be foolish not to grant this promotion." [DE 32-1 at 164, 136.] Xi argues these factors demonstrate Purdue's proffered concern with her research is so incredible that it is "unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (citation omitted).

15

Xi's argument is self-defeating. This is because even if I were to assume that Purdue was substantively wrong in its decision making (as Xi contends), that wouldn't be proof of pretext. At most, all that Xi has provided is circumstantial evidence that Purdue's evaluation of her research may have been inaccurate or unfair, but she provides no evidence that Purdue did not honestly believe she lacked the research prowess to merit promotion. As has been stated many times by the Seventh Circuit, "[i]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (citation omitted).

There is simply no evidence in the record that Purdue's stated reason for denying Xi's promotion was a lie. The Area Committee noted that "discussion focused on the quality of journals and conference proceedings in which she was publishing" and determined Xi "had no active funding." [DE 32-1 at 164.] Indeed, Xi's application listed her Army Research Lab grant as ending on May 14, 2024, and a second grant from the Army Research Office that expired on January 6, 2023. [*Id.* at 115.] In her deposition, Xi acknowledged that she considered "only one, [the] Army Research Lab" grant to be active at the time of her application. [*Id.* at 26–27.]

Xi indeed submitted documentation in her January 23, 2023, appeal that showed her Army Research Lab grant had been extended to October 6, 2027, but she did not submit this information with her initial application. [DE 37-2 at 71.] It is undisputed that the extension to 2027 of Xi's sole source of external funding was not before the Area

16

Committee, and she provides no evidence that Purdue's concerns with the criteria and competitiveness for her receipt of money from that source was insincere. The mere fact that Xi received a unanimous vote from the Primary Committee of her peers in the Department of Statistics does not somehow make the Area Committee's decision dishonest nor does it insulate her from the remaining levels in Purdue's promotion process.

The Parties' discussion of Xi's research credentials focuses on her receipt of the Research Refresh Award and the Area Committee's analysis of the same. There are several components to Xi's allegations concerning the Area Committee's treatment of this Award. Xi says she applied for the Research Refresh Award because of a high-risk pregnancy at the height of the COVID-19 pandemic. [DE 36 at 12.] It follows, according to Xi, that viewing her receipt of this Award negatively is evidence of sex discrimination. Xi also makes much of her allegation that Purdue never told her that the Award could be treated negatively in the promotion process. [*Id.* at 13.] Finally, Xi alludes to inconsistent treatment of recipients of the Research Refresh Award.

There is no question the Area Committee heavily relied on Xi's receipt of the Research Refresh Award to deny her promotion. Xi's application for the Award includes several references that her "research progress slowed down due to the unexpected pregnancy complication and the challenge to find childcare during the pandemic." [DE 32-1 at 166.] She added the Award "would give her a much-needed boost to help her regain momentum." [*Id.*] But Xi acknowledged in her deposition that she had no knowledge whether the Area Committee ever reviewed her application for

the Award when considering her request for promotion. [*Id.* at 24–25.] The evidence suggests the Area Committee did not. Xi's application for promotion noted her receipt of the Research Refresh Award, [*id.* at 99], but she did not elaborate on why she applied for (or may have received) the Award. Purdue also points to the testimony of Lucy Flesch and Peter Wolfe, both of whom attended but did not vote in the Area Committee meeting on Xi's promotion. Flesch and Wolfe both claim the Area Committee did not receive or review Xi's application for the Research Refresh Award. [DE 32-2 at 8, ¶33; DE 32-5 at 2, ¶6.] Xi has put forth no evidence that the Area Committee was even aware of her pregnancy nor the reasons she applied for the Award, much less that they relied on those reasons to make their decision.

Xi's claim of selective interpretation of the Award is similarly unsupported by the record. Xi admitted that in her January 18, 2023, meeting with Flesch and Hao Zhang concerning the Area Committee's review of her application for promotion, both Flesch and Zhang told her receipt of the Research Refresh Award may be interpreted as falling behind on one's research funding. [DE 32-1 at 54–55.] Though Xi says she was not aware of this possibility when she applied for the Award, she points to no evidence of inconsistent treatment of the Award by Purdue in the promotion process. Xi does not dispute Purdue's statement that the other two individuals from the College of Science who received the Research Refresh Award from 2018 to 2022 did not subsequently go through the promotion process to full professor. [DE 44 at ¶85.] Xi provides no evidence of inconsistent treatment through this comparison of dissimilar situations.

18

The Research Refresh Program policy for 2022 – 2023 that Xi includes in her response describes the program as geared towards professors "who would benefit from intense focus to advance their scholarship and reinvigorate their careers." [DE 37-2 at 16.] In fact, Xi herself admitted on her application for the Award that she needed assistance to "reinvigorate" her research. [DE 32-1 at 165.] Xi's claim that Purdue has identified no formal guidance that instructs reviewers to view the Award as indicative of problems securing research funding does nothing to suggest Purdue's reliance on her receipt of the Award was a lie or insincere. In short, Xi's disagreement with Purdue's treatment of her receipt of the Research Refresh Award does not prove pretext.

Lin's December 1, 2022, email announcing his resignation as Department Head for the Department of Statistics likewise does not provide a whiff of pretext evidence. In his email to Wolfe, Lin said he "failed" Xi and wrote "I am shame [sic] to be a department Head who is not able to promote our faculty." [DE 39-1 at 1.] Of note, he voices his opinion that "a similar (or even worse) case from another department went through." [*Id.*] This all sounds to me like nothing more than a sincere disagreement, not pretext.

Xi also argues Purdue's promotion of Anindya Bhadra provides evidence of pretext because he is a similarly situated employee who was treated more favorably.[1] Recall that Purdue concedes Bhadra is similarly situated for purposes of Xi's prima facie

---

[1] Xi also points to Raghu Pasupathy as a comparator, but I quickly dispense of this argument. Purdue promoted Pasupathy during a different promotion cycle that included different reviewers. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d 760 (noting that when "different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.") (citation omitted).

case. [DE 30 at 10.] But whether there is a similarly situated comparator is also relevant to the pretext analysis. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.") (citation omitted). Purdue has, of course, not conceded anything with respect to Bhadra's status as similarly situated to Xi for pretext purposes.

Plaintiffs may demonstrate discrimination by pointing to differential treatment of a "similarly-situated employee who was not in the protected class." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). The Seventh Circuit has cautioned against too rigid an application of this analysis. It is a "flexible" analysis that considers "all relevant factors, the number of which depends on the context of the case." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (citation omitted). Common factors include whether the individuals had the same supervisor, were subject to the same standards, engaged in similar conduct, and lacked differentiating or mitigating circumstances that distinguished their conduct. *Id.* But at bottom, the analysis focuses on "eliminat[ing] confounding variables" and deciding whether "there are enough common features between the individuals to allow a meaningful comparison[.]" *Id.*

Let's first consider whether Bhadra is in fact similarly situated to Xi. Xi says Purdue promoted Bhadra to full professor in December 2022. [DE 37-2 at 73.] Xi claims Bhadra had fewer publications, less external research funding, and supervised fewer graduate mentees than herself. [DE 36 at 13.] For example, Bhadra received five total

grants since 2018 while Xi received eleven total grants since 2011. [DE 37-2 at 73–74.]

Bhadra has supervised four students since his prior promotion while Xi has supervised

twelve. [*Id.* at 75–76.] There are two key problems with Xi's one to one comparison of

credentials. First, as noted above, courts reviewing Title VII claims are not tasked with

subjective analysis of professors' credentials, scholarship, and mentorship. We are ill

equipped for that task. *See Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 541 (7th Cir.

2016) ("[S]cholars are in the best position to make the highly subjective judgments

reviewing scholarship and tenure"), *overruled on other grounds by Ortiz*, 834 F.3d 760 (7th

Cir. 2016).

Moreover, "differences in qualifications between job candidates, on their own,

cannot be evidence of discrimination unless those differences are so favorable to the

plaintiff that there can be no dispute among reasonable persons of impartial judgment

that the plaintiff was clearly better qualified for the position at issue." *Id.* Xi has not

presented evidence to meet this bar. For example, part of the difference in Xi's and

Bhadra's total number of grants, supervisees, and publications can be explained by the

fact that Xi has been an associate professor seven years longer than Bhadra. [DE 37-2 at

73.] And the Seventh Circuit has specifically cautioned against strict comparison of the

quality versus quantity of academics' publications and other achievements. *See Blasdel*,

687 F.3d at 816 ("If *A* publishes an excellent academic paper every five years on

average, is she better or worse than *B*, who publishes a good but not excellent paper on

average every six months, so that at the end of five years he has published 10 papers

and she only 1?.")

21

Purdue points out important differences in Bhadra's promotion process that suggest he is not, in fact, a proper comparator. Above all else, Bhadra did not receive the Research Refresh Award. [DE 36 at 13.] Bhadra's Nomination for Promotion Form 36 reflects the Area Committee weighed his funding from NSF and NIH and "strong publication record in tier 1 journals." [DE 32-2 at 105.] More importantly, another key differentiator was Bhadra's receipt of an offer from North Carolina State University to enter as a full professor. Bhadra used this offer as leverage to get a full professorship from Purdue. Indeed, there are emails in the record where Bhadra requests a formal counteroffer at the "full professor level" in light of his offer for a full professorship from NC State. [DE 39-2 at 8.] In response, Purdue said it would put Bhadra's promotion "on an appropriately aggressive track." [*Id.* at 7.] Xi believes this email thread raises suspicion that Purdue may have sped up its consideration of Bhadra's promotion. Perhaps it did. But I'm at a loss to see how that shows discrimination against Xi especially because Xi did not have a similar offer from a rival university.

In sum, Xi has not presented sufficient evidence to raise a triable issue on whether Purdue's promotion of Bhadra suggests its decision to not promote Xi was pretextual. For that reason and the others discussed above, summary judgment must therefore be granted on the Xi's discrimination claims.

## II.    Retaliation Claim (Count V)

Xi also alleges Purdue retaliated against her by refusing to permit her to re-apply for promotion to full professor "within a reasonable time." [DE 1 at ¶49.] Under Title VII, it is unlawful for an employer to retaliate against an employee because he or she

opposes an employment practice proscribed by Title VII or because he or she

participates in an investigation or proceeding under Title VII. *See* 42 U.S.C. § 2000e-3(a);

*Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 633 (7th Cir. 2022). To survive summary

judgment on her retaliation claim, Xi must provide evidence that (1) she engaged in

activity protected by Title VII; (2) she suffered an adverse employment action; and (3)

there is a causal link between the protected activity and the adverse employment action.

*Id.*

Purdue argues Xi fails to prove each element of her Title VII retaliation claim, but

it also argues the Court need not reach the issue because Xi failed to exhaust her

administrative remedies. Generally, "a Title VII plaintiff cannot bring claims in a

lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31

F.3d 497, 500 (7th Cir. 1994); *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099–1100 (7th Cir.

2013) ("[P]laintiffs may pursue only those claims that could reasonably be expected to

grow out of the administrative charges."). But a plaintiff may bring claims in a lawsuit

if they are "like or reasonably related to the allegations of the charge and growing out of

such allegations." *Cheek*, 31 F.3d at 500 (citation omitted). The Seventh Circuit has

clarified that the claim and the administrative charge must "at minimum, describe the

same conduct and implicate the same individuals." *Reynolds*, 737 F.3d at 1100 (internal

quotation marks and citation omitted).

It is a close call whether Xi exhausted her administrative remedies. On the one

hand, Xi explicitly chose not to check the retaliation box in her Charge of Discrimination

form. [DE 32-1 at 94.] But on the other hand, reasonable minds could conclude that her

retaliation claim is inter-woven with her claims of discrimination. Because Xi's retaliation claim fails on the merits, I will simply note that Purdue has preserved the exhaustion argument and proceed to the substance of the retaliation claim.

Xi's theory of her case fails to create a triable issue on whether she engaged in Title VII protected activity. Xi must demonstrate she took "some step in opposition to a form of discrimination that [Title VII] prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). Xi need not show that the practice she opposed in fact violated Title VII, but her opposition to the practice at issue "must be based on a good-faith and reasonable belief that [she] is opposing unlawful conduct." *Id*. Xi argues her submission of a written internal appeal challenging the denial of her promotion to Full Professor was protected activity. But while "filing an official complaint with an employer may constitute statutorily protected conduct under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

For starters, Xi's appeal of her application for promotion contains no mention of discrimination based on race or national origin. Xi has therefore presented no evidence that she filed her appeal on a belief she was opposing unlawful conduct based on these protected characteristics. Xi's appeal does, contrary to Purdue's insistence otherwise, make several references to her sex. For example, she notes she applied for the Research Refresh Award because of the impact of the COVID-19 pandemic on her "as a female faculty member with two young children." [DE 32-1 at 185.] She also argued the Area Committee provided inadequate consideration of her qualifications as compared to a

male faculty member "who lacked the same family obligations during the pandemic." [*Id.*]

Xi's argument that her appeal was protected activity fails to support an inference that she opposed discrimination on the basis of her sex. Xi did not have to "use the magic words sex or gender discrimination . . . [but] she has to at least say something to indicate her gender is at issue." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (internal quotation makrs and citation omitted). Xi's first reference to being a "female faculty member with two young children", [DE 32-1 at 185], describes why she applied for the Research Refresh Award. It does not indicate that she believes Purdue discriminated against her because of her sex. Moreover, the substance of her comparison to her two male colleagues focused not on their sex but on the number of students supervised, publications, and research grants. [*See id.* at 186–97.]

It is true that Xi's appeal noted that her colleagues were male and "lacked the same family obligations during the pandemic." [*Id.* at 185.] But these allegations are tied to caregiver status, which is not on its own a protected characteristic. *See Boyd v. Advanced Physicians*, Case No. 22-CV-7012, 2024 WL 1363421, at *5 n.4 (N.D. Ill. Mar. 29, 2024) (noting "the plain language of Title VII does not prohibit discrimination solely based upon caregiving responsibility or family responsibilities."). Even to allege retaliation under a so called "plus" claim, which Xi does not allege, Xi still "must allege discrimination, harassment, or retaliation based on a protected characteristic plus familial status and not familial status alone." *Id.* Xi has failed to present such evidence.

In fact, after thoroughly reviewing Xi's briefing, I cannot find *any* substantive response to Purdue's claim that she did not engage in protected activity.

Even if we assume Xi engaged in protected activity, there is no evidence that she suffered a materially adverse action. The standard for a materially adverse action in the context of a Title VII retaliation claim is "easier to satisfy than the comparable standard for Title VII discrimination claims[.]" *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 912 (7th Cir. 2022); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("Title VII's substantive provision and its antiretaliation provision are not coterminous."). To be "materially adverse", Xi must show that Purdue's action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal citation omitted). The adverse action element of a retaliation claim is frequently described in terms of an adverse *employment* action, but the Supreme Court has been clear that the adverse action need not affect the plaintiff's "terms and conditions of employment." *Id.* at 64.

Xi advances no facts to create a triable issue on whether Purdue subject her to an adverse action. Xi alleges Purdue retaliated against her by prohibiting her from re-applying for promotion to Full Professor until 2024 instead of 2023. They did no such thing. The only evidence advanced by Xi are her deposition comments that Cziczo told her to "give up" on re-applying for Full Professor. [DE 32-1 at 58.] Xi says she clandestinely recorded Cziczo as he made these comments during her annual review on April 5, 2023, [*id.* 55–56], but she did not provide the Court with a copy of this recording

during briefing on Purdue's motion for summary judgment. Cziczo denies having made that comment. [DE 32-6 at 2, ¶8.]

While a disputed issue of fact, this alleged exchange does not rise to the level of an adverse action that could have dissuaded a reasonable person from making or supporting a charge of discrimination. In *Barker v. YMCA of Racine*, the Seventh Circuit rejected the plaintiff's claim that her supervisors' emails and comments requesting the plaintiff to withdraw her state discrimination claim against them constituted an adverse action. 18 Fed.Appx. 394, 398 (7th Cir. 2001). The Seventh Circuit noted that the supervisors' comments may have made plaintiff "uncomfortable", but they were not evidence of threats or efforts to prevent the plaintiff from pursuing her claims. *Id*. Even assuming Xi is correct that Cziczo told her he would "give up" if he were in Xi's position, this discouragement is too thin, certainly thinner than in *Barker*, to be considered an adverse action.

Xi has presented no other evidence of adverse action by Purdue. To the contrary, Xi's allegations that Cziczo prohibited her from re-applying in 2023 are clearly refuted by the documentary evidence presented. The evidence suggests Purdue merely cautioned Xi that it would be an uphill battle to re-apply in 2023 because she would have to re-use her letters of recommendation. Cziczo emailed Xi that there were "issues . . . with running a case in two consecutive years . . . due to the 24-month 'life' [cycle] of a letter of reference." [DE 32-1 at 218.] Cziczo wrote "it is typically not possible" to apply in back-to-back years, but he said he was "of course be open to discussing what the implications are regarding [Xi reapplying in] 2023." *Id*. The full context of these

emails paints a different picture of this exchange. Cziczo's email suggests he had concerns with Xi applying in back-to-back years with the same letters of recommendation, but he indicated an openness to discussing that possibility. No reasonable jury could find that Cziczo's words of caution and Purdue's application of a broadly applicable policy concerning letters of recommendation for the College of Science constituted an adverse action. *See Kinsella v. Ill. Bell Tel. Co., LLC.*, No. 18 C 7803, 2021 WL 3737731, at *12 (N.D. Ill. Aug. 24, 2021) (finding plaintiff's allegations "stem[med] from a company policy that affected every employee", including plaintiff, so did not rise to the level of adverse action). The evidence suggests Purdue recommended Xi wait another year to re-apply so she could strengthen her application with new letters of recommendation. No reasonable juror could conclude that Purdue's response would deter others from filing charges of discrimination.

Finally, Xi presents no triable issues concerning causation. The standard for causation in a Title VII retaliation case is traditional but-for causation. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014). Flesch met with Xi on January 18, 2023, and suggested Xi wait to re-apply until 2024 to acquire new letters of recommendation. [DE 32-2 at 9, ¶38; 10, ¶42.] Importantly, this meeting occurred *before* Xi submitted her January 25, 2023, application for reconsideration, which she says initiated Purdue's retaliation. The fact that Purdue had already recommended Xi wait another year to re-apply before the event she says instigated that response weakens the already loose connection between these events.

Additionally, Purdue's Operating Procedures for Granting Academic Tenure forbade Xi from nominating herself for promotion because she had been considered for promotion within the previous three years. [DE 32-2 at 68.] Thus, Xi was dependent on the Statistics Primary Committee to nominate her for promotion in the 2023 cycle. The Primary Committee declined to nominate Xi, but Xi presented no evidence that this was because of her January 2023 request to reconsider her 2022 application for promotion. Xi claims that Cziczo's decision to check with the College of Science concerning her eligibility for re-applying in 2023 is murky and similarly unsupported. In her deposition, Xi suggested Cziczo should not have consulted with the College of Science concerning her re-applying in 2023. [DE 32-1 at 77–79.] But there is again no evidence that the College of Science directed Cziczo or the Department of Statistics to forbid Xi from re-applying because of her appeal of her 2022 application. Rather, the evidence suggests Cziczo, as interim dean from a different department, was not familiar with the application process for the Department of Statistics.

Xi also vaguely claims without evidence that Purdue in April 2023 changed its university-wide policy concerning letters of recommendation in retaliation for her January 2023 request for reconsideration. Xi points to an undated College of Science Promotion Outline from 2023 that references an April 2023 memo which announced a new policy that "deans will explicitly review and sign off on all letter-writers in advance of the letters being solicited." [DE 32-1 at 212–13; 82–85.] Xi suggests Lin's resignation as head of the Department of Statistics triggered this policy change and that Cziczo somehow had a hand in securing this change. [*Id.* at 85–86.] But by Xi's own

admission she "do[es] not know" how or why Cziczo purportedly changed this policy.
[*Id.* at 86.] There is simply nothing in the factual record presented by Xi to support this
bare-bones allegation of a university-wide conspiracy to change broadly applicable
rules concerning letters of recommendation in response to her January 2023 request for
reconsideration. Because Xi has presented no facts to create a triable issue of a prima
facie case of retaliation, summary judgment is warranted for Purdue on this claim too.

### Conclusion

Accordingly, Defendant The Trustees of Purdue University's Motion for
Summary Judgment [DE 29] is **GRANTED**. Summary judgment is **GRANTED** in favor
of The Trustees of Purdue University. The Clerk is instructed to **CLOSE** this case.

**SO ORDERED**.

ENTERED: September 8, 2025.

/s/ Philip P. Simon
UNITED STATES DISTRICT JUDGE